1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK PINDER, | No. 2:13-cv-00817-TLN-DB |
| Plaintiff, | |
| v. | **ORDER** |
| EMPLOYMENT DEVELOPMENT DEPARTMENT, et al., | |
| Defendants. | |

This matter is before the Court pursuant to Defendants Employment Development Department ("EDD"), Richard Rogers and David Derks's (collectively hereinafter referred to as "Defendants") Motion for Summary Judgment or, alternatively, Summary Adjudication. (ECF No. 50.) Plaintiff Frank Pinder ("Plaintiff") opposes Defendants' motion. (ECF No. 58.) Defendants have filed a reply. (ECF No. 60.) The Court has carefully considered the arguments raised by the parties. For the reasons set forth below, Defendants' Motion for Summary Judgment or, alternatively, Summary Adjudication is GRANTED.

## I.   FACTUAL BACKGROUND[1]

Plaintiff is an African American male. (Pl.'s Resp. to Defs.' separate statement of

---

[1]     As explained in more detail in Section III of this Order, the Court has examined the record carefully along with the objections to determine whether the facts submitted by the parties are supported and whether a genuine dispute exists. This section is composed of those facts that the Court has found are not in dispute.

1   undisputed material facts, ECF No. 58-1 at ¶ 1.)  On or about January 4, 2010, Plaintiff began

2   working for EDD as a System Software Specialist III Supervisor for the Business Applications

3   Services Group.  (ECF No. 58-1 at ¶ 2.)  Plaintiff supervised a staff of approximately 20 people.

4   (*See* Defs.' Resp. to Pl.'s separate statement of undisputed material facts, ECF No. 60-3 at ¶ 4.)

5   Plaintiff alleges that he received no "complaints" and was not otherwise "counseled about [his]

6   performance" during his first month of employment.  (Pl.'s Decl., ECF No. 58-3 at ¶ 9.)  The

7   parties seem to agree that Plaintiff had no immediate supervisor during that period.  (ECF No. 60

8   at 4; Pl.'s Dep.,[2] 18:18–19.)

9       Derks, a white male, began his employment with EDD as the Client Solutions Section

10   Chief on or about February 2, 2010.  (ECF No. 58 at 5; ECF No. 58-1 at ¶ 7; ECF No. 60 at 3–4.)

11   Derks was Plaintiff's immediate supervisor from February until on or about August 30, 2010.

12   (ECF No. 58-1 at ¶¶ 8, 34.)

13       In approximately February 2010, Derks informed Plaintiff that there was a perception by

14   Plaintiff's staff that Plaintiff was unable to perform his job.  (ECF No. 58-1 at ¶ 9.)  Plaintiff

15   claims there was no such perception but does not dispute being told this.  (ECF No. 58-1 at 4;

16   Pl.'s Dep., 19:10–11.)

17       Derks removed Plaintiff from participating in hiring panels to interview new staff

18   members because Derks received feedback that Plaintiff argued with other members of the

19   interview panel in front of the interviewees.  (ECF No. 58-1 at ¶ 14.)  Plaintiff claims he was

20   removed in February 2010 as a result of an interview that took place in January 2010.  (ECF No.

21   58-1 at 5; Pl.'s Dep., 40:3–44:5.)

22       Beginning in February 2010, Plaintiff and Derks had one-on-one meetings on a near

23   weekly basis until August 2010.  (ECF No. 58-1 at ¶ 11.)  Plaintiff in his deposition also

24   identified impromptu one-on-one meetings.  (*See, e.g.*, Pl.'s Dep., 54:1, 6.)  The parties seem to

25   agree that these were work-related meetings.  (ECF 50-2 at ¶ 10; *see, e.g.*, Pl.'s Dep., 52:19–20,

26   54:6–18.)  In his declaration, Derks stated that he "conducted regular one-on-one meetings with

27   _____

   [2]    Throughout this Order the Court refers to transcripts of Plaintiff's deposition ("Pl.'s Dep."), excerpts are
28   attached as an exhibit to the declaration of Michelle A. Marzahn.  (ECF No. 50-3, Ex. C).  Additionally, a courtesy
   copy has been lodged with the Court.  (*See* ECF No. 51.)

1    Plaintiff regarding project status, work performance, and expectations." (ECF No. 50-4 at ¶ 7.)

2    Plaintiff's discussions of these meetings in his deposition are consistent with that description.

3    (*See generally* Pl.'s Dep., 51:12–72:24.)[3]  Plaintiff's deposition testimony provided a non-

4    exhaustive list of topics that were subjects of one-on-one meetings with Derks on unspecified

5    days.  (*See* Pl.'s Dep., 51:12–72:24.)  These included Plaintiff's difficulties having his staff

6    perform assignments, Plaintiff's alleged failure to provide Derks with requested data, and

7    discussions of Derks's dissatisfaction with Plaintiff's responses to technical questions regarding

8    information technology.  (*See* Pl.'s Dep., 55:3–13, 55:14–56, 61:4–6, 63:3–15.)  Plaintiff recounts

9    that "in some instances [at these meetings Derks] would tell me I am not doing my job" and that

10   this feedback was "a common thing every day."  (Pl.'s Dep., 54:16–18, 60:6–9, 69:10–11.)

11        Plaintiff viewed Derks's criticism to have stemmed from alleged deficiencies on Derks's

12   part, e.g., inexperience working with state and union employees, lack of technical understanding

13   and difficulty controlling Derks's anger.  (*See, e.g.*, Pl.'s Dep., 56:4–9, 61:4–9, 66:1–2.)  Plaintiff

14   viewed Derks's behavior, tone, word choice and questions during one-on-one meetings to be

15   inappropriate, unprofessional and condescending.  (*See, e.g.*, Pl.'s Dep., 54:9–11, 60:17–61:10,

16   72:1–22).  Plaintiff described Derks's manner as "aggressive" and did not like Derks's "tone" and

17   "demeanor" when Plaintiff perceived Derks to be "upset" or "something was wrong."  (Pl.'s

18   Dep., 54:9–18.)  Plaintiff viewed some of the work related questions asked by Derks as

19   condescending because they covered things Plaintiff "obvious[ly] … should have known" from

20   the qualifications Plaintiff listed on his résumé.  (Pl.'s Dep., 60:17–61:10.)  Plaintiff was

21   particularly upset by the way he was told to "sit" during a specific one-on-one meeting and

22   characterized this as a "racial comment" in his deposition.  (Pl.'s Dep., 72:1–24 ("[T]here was

23   something in his language and the way he said it, it was like he was talking to a dog."))

24        Other than the one instance of being told to "sit," Plaintiff did not identify any other

25   specific instance of perceived "racial comments" made by Derks.  (Pl.'s Dep., 72:1–24.)

---

26   [3]      Plaintiff has improperly disputed ¶ 10 of Defendants' statement of undisputed material facts ("DSUMF")
     (ECF No. 50-1 at ¶ 10) in the manner described in more detail in Section III.  Upon reviewing the citation to the
27   record in support of ¶ 10 of DSUMF, it is clear Defendants have conflated some of Plaintiff's statements regarding
     impromptu meetings to characterize the weekly ones.  Consequently, the Court briefly summarizes the portions of
28   Plaintiff's deposition at issue.

Additionally, Plaintiff stated that Derks had never discussed anyone else's race to Plaintiff's knowledge.  (Pl.'s Dep., 72:17–20.)  When asked generally what Plaintiff perceived as motivating Derks to ask Plaintiff "condescending" questions, Plaintiff responded that he did not know.  (Pl.'s Dep., 65:3–66:2 ("I don't know what he saw in me …. [T]o answer your question why he acts like that …. I don't know what was going on with him.")  When asked about Plaintiff's perception of Derks interaction with other employees, Plaintiff indicated that Derks was "forceful with everyone" and recounted that on one occasion members of Plaintiff's team were unwilling to complete a task for Derks because they were "not happy with [Derks's] way of talking to them or dealing with them…." (Pl.'s Dep., 55:21–22, 57:25–58:2.)

On or about May 7, 2010, Derks informed Plaintiff by email that he was "disappointed" in incomplete data received from Plaintiff.  (ECF No. 58-1 at ¶ 15; ECF No. 50-4 at ¶ 10.)

On or about May 11, 2010, Derks reassigned procurement responsibilities from Plaintiff to another staff member.  (ECF No. 58-1 at ¶ 16.)  In his declaration Derks stated that this was done because "Plaintiff had not completed or managed the procurements[,] there were tight deadlines [and] Plaintiff's primary technical resource was frustrated with Plaintiff's leadership." (ECF No. 50-4 at ¶ 11.)

On or about May 11, 2010, Derks informed Plaintiff that EDD management was concerned Plaintiff was not technically qualified, and this perception was affecting Plaintiff's ability to lead his group.  (ECF No. 58-1 at ¶ 17.)  Derks offered to train Plaintiff on the technical environment of EDD.  (ECF No. 58-1 at ¶ 17.)

On or about May 12, 2010, Plaintiff spoke with EDD's mediation group about Derks's "behavior," forwarding them a copy of an email[4] about reassigning Plaintiff's procurement responsibilities and received a mediation form.  (ECF No. 58-1 at ¶ 18; ECF No. 60-3 at ¶ 26.)  In Plaintiff's deposition he describes speaking to an unnamed person at what appears to be EDD's mediation office[5] regarding his "concerns about not having the opportunity to do my job and not

---

[4]      Plaintiff's declaration indicates the email in question is attached as an exhibit, but it is not.  (*See* ECF No. 58-3.)

[5]      The parties at times seem generally confused as to what happened here calling this a group that "works with managers and supervisors," a "manager group," "a group that EDD has that [Plaintiff] spoke to," "EDD Mediation Office" and "EEO." (*See* ECF No. 58-1 at ¶ 18; ECF No. 58-3 at ¶ 26; Pl.'s Dep., 75:12–19, 77:7, 77:11, 77:15.)

1  doing the duties that I was hired to perform." (Pl.'s Dep., 75:12–19.)

2       On or about May 14, 2010, Plaintiff received his first probationary report with an overall

3  rating of "unacceptable." (ECF No. 58-1 at ¶ 19.) The report detailed concerns about perceived

4  deficiencies in Plaintiff's job performance. (ECF No. 58-1 at ¶ 19; ECF No. 50-4 at ¶ 13.) In his

5  declaration Derks states that he prepared the report "several days" prior to Plaintiff receiving it

6  and that it had been reviewed prior to it being given to Plaintiff. (ECF No. 50-4 at ¶ 13.) Rogers,

7  an African American male, was the "Reviewing Officer" for Plaintiff's first probationary report.

8  (ECF No. 58-1 at ¶ 6; ECF No. 60-3 at ¶ 27.) During the period that Derks was Plaintiff's

9  immediate supervisor, Rogers was Plaintiff's second-line supervisor. (ECF No. 58-1 at ¶ 5.)

10  Derks reported to Rogers. (ECF No. 58-1 at ¶ 7.) Rogers previously held Plaintiff's position

11  before Plaintiff was hired. (ECF No. 58-1 at ¶ 3.) Rogers made the ultimate decision to hire

12  Plaintiff. (ECF No. 58-1 at ¶ 4.)

13       On or about May 24, 2010, Derks had a one-on-one meeting with Plaintiff and provided

14  him with a memorandum entitled "Weekly One-One Review." (ECF No. 58-1 at ¶ 20.) During

15  the meeting and in the memorandum, Derks informed Plaintiff that Derks had determined that

16  Plaintiff had not met certain expectations and deadlines described in the memorandum. (ECF No.

17  58-1 at ¶ 20.) Plaintiff disputes having failed to meet those expectations and deadlines. (ECF

18  No. 58-3 at ¶ 29.) The parties disagree about whether Plaintiff failed to turn in certain time cards

19  for Derks's review at this meeting. (ECF No. 58-1 at ¶ 20; ECF No. 58-3 at ¶ 29.)

20       On or about May 27, 2010, Plaintiff filed a complaint with EDD's EEO Office, alleging

21  that he was experiencing discrimination based on race, as well as bias/harassment and retaliation.

22  (ECF No. 58-1 at ¶ 21.) The complaint attached the first probationary performance evaluation,

23  the May 24, 2010 memorandum from Derks, and a rebuttal to the probation report. (ECF No. 58-

24  1 at ¶ 21.) On or about May 28, 2010, Plaintiff provided Derks with a "rebuttal" to the first

25  _____

26  The only real clarity provided is that EDD's Equal Employment Opportunity ("EEO") office was not contacted until
   "a while" after this earlier event and that the parties have appeared to agree the latter occurred on May 27, 2010 due
   in part to the repeated representations of Plaintiff's counsel. (Pl.'s Dep., 77:17–21, 78:24–79:14.) Despite this, at
27  times, there are indications by both parties that sometime earlier in May another EDD EEO complaint of some sort
   may have been made. (*Compare* ECF 60-3 at ¶ 26 *and* ECF No. 58 at 7 *with* ECF No. 50-1 at 27–28 *and* Pl.'s Dep.
   75:3–80:1.) As discussed in footnote 14, if such a report occurred it would not change the outcome of Defendants'
28  motion.

1    probationary performance evaluation.  (ECF No. 58-1 at ¶ 22.)

2          On or about June 1, 2010, Derks communicated to Plaintiff that Plaintiff had provided "no

3    real feedback" when asked about troubleshooting processes and was unable to answer if Plaintiff

4    had completed his weekly status report.  (ECF No. 58-1 at ¶ 23; ECF No. 60-3 at ¶ 32.)  Plaintiff

5    acknowledges receiving a message to this effect from Derks but denies it accurately represents

6    what happened.  (ECF No. 60-3 at ¶ 32.)

7          On or about June 12, 2010, Plaintiff informed Derks that it was impossible to provide

8    information regarding "IT-SM metrics."  (ECF No. 58-1 at ¶ 24.)  However, two other staff

9    members had already provided this information to Derks.  (ECF No. 58-1 at ¶ 24.)

10          By approximately June 22, 2010, Derks had not received a requested "project charter"

11    from Plaintiff, the project in question was incomplete, and it was unclear to Derks whether

12    Plaintiff knew the status of the project.  (ECF No. 58-1 at ¶ 25; ECF No. 50-4 at ¶ 17.)

13          In approximately June 2010, a mediator from the Department of Industrial Relations

14    ("DIR") met individually with Plaintiff and Derks, and collectively with Plaintiff, Derks, and

15    Rogers.  (ECF No. 58-1 at ¶ 28.)  Plaintiff's declaration together with his deposition suggest this

16    took place on approximately June 23, 2010, and was in connection with Plaintiff's EEO

17    complaint.  (*See* ECF No. 58-3 at ¶¶ 34–35; Pl.'s Dep., 80:2–83:23.)

18          On or about June 23, 2010, the EEO Office sent Plaintiff a letter in response to his May

19    27, 2010, EEO complaint stating that Plaintiff's complaint had been closed on June 23, 2010,

20    without a finding of racial discrimination or retaliation.  (ECF No. 58-1 at ¶ 26.)

21          On or about June 29, 2010, Plaintiff missed a meeting concerning Plaintiff's team's

22    workload that was attended by Derks, Rogers and all System Software Specialist III staff, except

23    Plaintiff, without providing any explanation.  (ECF No. 58-1 at ¶ 27.)

24          On or about July 16, 2010, Derks spent three hours revising a status report after

25    concluding the one submitted by Plaintiff was below "expectations."  (ECF No. 58-1 at ¶ 29.)

26          On or about August 2, 2010, Derks offered to provide project management overview

27    training to Plaintiff, but Plaintiff declined the training, stating he was qualified to lead projects.

28    (ECF No. 58-1 at ¶ 30.)

On or about August 23, 2010, Derks and Plaintiff met one-on-one.  (ECF No. 58-1 at ¶ 31.)  Derks asserts he asked Plaintiff what Plaintiff thought the reason was for the tension between them.  (ECF No. 50-4 at ¶ 21.)  Derks asserts Plaintiff refused to answer, stating Plaintiff was doing the best job Plaintiff could do to meet EDD requirements and did not care about Derks's expectations.  (ECF No. 50-4 at ¶ 21.)  Plaintiff asserts that Derks spoke to Plaintiff in an "unprofessional manner" during the meeting.  (ECF No. 58-3 at ¶ 38.)  Later that day, Plaintiff sent an email to that effect to Rogers copying the mediator from DIR.  (ECF No. 58-1 at ¶ 32.)

On August 24, 2010, Rogers informed Plaintiff that the one-on-one meetings between Derks and Plaintiff would end and Plaintiff would report directly to Rogers.  (ECF No. 58-1 at ¶ 33.)  On approximately August 30, 2010, Rogers became Plaintiff's immediate supervisor.  (ECF No. 58-1 at ¶ 34.)

On or about September 10, 2010, Plaintiff met with Rogers and Derks and received his second probationary report with an overall rating of "unacceptable."  (ECF No. 58-1 at ¶ 36.)  The report detailed concerns about perceived deficiencies in Plaintiff's job performance.  (ECF No. 58-1 at ¶ 36.)  The report was prepared by Derks and reviewed by Rogers.  (ECF No. 60-3 at ¶ 41.)  At the meeting Plaintiff stated he would provide a proper response to the report when he returned from vacation.  (ECF No. 58-1 at ¶ 37.)  Plaintiff was on vacation from on or about September 13, 2010 through September 20, 2010.  (ECF No. 58-1 at ¶ 38.)  Rogers followed up on the status of Plaintiff's response to the probationary report on or about September 20, 2010 after Plaintiff's return from vacation.  (ECF No. 58-1 at ¶ 39.)  On approximately September 30, 2010, Plaintiff provided Rogers with a "rebuttal" to the report.  (ECF No. 58-1 at ¶ 40.)

On or about October 6, 2010, Plaintiff informed Rogers that Plaintiff would not participate in a mandatory manager/supervisor meeting because he was picking up items for a potluck.  (ECF No. 58-1 at ¶ 41.)  During this time, Rogers informed Plaintiff of a work assignment with certain tasks and with specific deadlines.  (ECF No. 58-1 at ¶ 42.)  Plaintiff did not meet any of the deadlines set forth in the October 6, 2010 work assignment.  (ECF No. 58-1 at ¶ 43.)  Plaintiff indicates these deadlines were set without "negotiat[ing]" with Plaintiff, which Plaintiff asserts EDD required Rogers to do.  (ECF No. 58-3 at ¶ 43.)

On or about November 6, 2010, Rogers provided Plaintiff with a memorandum outlining the missed deadlines, setting new deadlines, and informing Plaintiff that he would receive an interim probationary report. (ECF No. 58-1 at ¶ 44.) Plaintiff missed the new deadlines set by Rogers on November 6, 2010, for the work assignment originally assigned October 6, 2010 and made no significant progress on the assignment. (ECF No. 58-1 at ¶ 45.)

On December 2, 2010, Rogers met with Plaintiff and gave him an interim probationary report with an overall rating of "unacceptable." (ECF No. 58-1 at ¶ 46.) Plaintiff was informed that without immediate improvement, EDD would seek to reject Plaintiff from probation, i.e., terminate his employment. (ECF No. 58-1 at ¶ 46.)

On December 29, 2010, Plaintiff was notified that he would be terminated with an effective date of January 7, 2011. (ECF No. 58-1 at ¶ 47.) Rogers stated that he was the ultimate decision maker who decided to terminate Plaintiff because of his poor job performance. (ECF No. 50-6 at ¶ 19.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of

1   fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

2       **III.**   **ANALYSIS**

3       The claims not disposed of by the Court's order granting in part and denying in part

4   Defendants' motion to dismiss are: (1) discrimination based on race pursuant to California's Fair

5   Employment and Housing Act ("FEHA") against EDD; (2) discrimination based on race pursuant

6   to Title VII of the Civil Rights Act of 1964 ("Title VII") against EDD; (3) harassment based on

7   race (pursuant to FEHA and Title VII against EDD; pursuant to FEHA only against the individual

8   defendants); (4) retaliation pursuant to FEHA and Title VII against EDD; (5) retaliation pursuant

9   to California Labor Code §§ 98.6 and 1102.5 against EDD; (6) failure to prevent harassment,

10  discrimination, and retaliation against EDD; (7) violation of California Labor Code §§ 226.7 and

11  512 against EDD; and (8) a claim under California's Private Attorneys General Act ("PAGA")

12  against EDD pursuant to California Labor Code §§ 2698 and 2699.  (*See* ECF Nos. 8, 19.)

13      Defendants argue that summary judgment or, alternatively, summary adjudication, is

14  appropriate as to the remaining claims because there are no genuine issues of material fact, and

15  Defendants are entitled to judgment as a matter of law.  (*See generally* ECF Nos. 50, 50-1, 60).

16  The Court analyzes Plaintiff's racial discrimination claims under a disparate treatment theory

17  together due to the similarities of Title VII and FEHA.  The Court will do likewise with

18  Plaintiff's racial harassment and retaliation claims.

19          A.    Brief Discussion of Defendants' Objections

20      Defendants filed thirty-two evidentiary objections to Plaintiff's declaration and nearly an

21  equal number to Plaintiff's separate statement of undisputed facts.  (*See* ECF No. 60-1; ECF No.

22  60-3.)  This includes arguing that Plaintiff's declaration should not be considered in its entirety

23  for failure to state that it was made on personal knowledge and its alleged failure to "affirmatively

24  demonstrate" Plaintiff is competent to testify about the matters stated in the declaration.  (ECF

25  No. 60-1 at 2.)  The Court declines to strike Plaintiff's declaration in its entirety as it is clear from

26  the context that substantial portions of the declaration cover topics that are within Plaintiff's

27  personal knowledge and competency, e.g., the date of his hire, who interviewed him, whom he

28  supervised, etc. *See generally Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.

1  1990) ("That Rule 56(e)'s requirements of personal knowledge and competence to testify have
2  been met may be inferred from the affidavits themselves.")

3  For efficiency's sake the Court does not address each of the remaining evidentiary
4  objections separately here as this is unnecessary to resolve the motion.  *See Wynes v. Kaiser*
5  *Permanente Hosps.*, 936 F. Supp. 2d 1171, 1180 n.8 (E.D. Cal. 2013).  The Court agrees that
6  many of Plaintiff's attempts to controvert the Defendants' statement of undisputed material facts
7  are done in an inappropriate manner.  (*See generally* ECF No. 60-2 (indicating that in
8  Defendants' view each of their proffered undisputed material facts remains undisputed).)
9  Plaintiff purports to dispute twenty-eight of Defendants' proffered undisputed facts.  (*See*
10 *generally* ECF No. 58-1.)  In many instances these attempts are "puzzling and fail[] to raise
11 serious questions of disputed fact."  *See Leramo v. Premier Anesthesia Med. Grp.*, 2:09-cv-2083
12 LJO JTL, 2011 WL 2680837, at *8 (E.D. Cal. July 8, 2011), *aff'd*, 514 F. App'x 674 (9th Cir.
13 2013).

14 As Defendants point out, where Plaintiff attempts to controvert Defendants' proffered
15 undisputed facts, Plaintiff largely fails to confront them at all, citations to Plaintiff's declaration
16 notwithstanding.  (*See generally* ECF No. 60-2.)  This fundamental deficit is more fruitfully and
17 efficiently analyzed against the summary judgment standard itself.  *See generally Burch v.*
18 *Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1123 (E.D. Cal. 2006) (noting that "objections to
19 evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it
20 constitutes an improper legal conclusion are all duplicative of the summary judgment standard
21 itself").  In short, as stated in footnote 1 of this Order and in the paragraphs to follow, the Court in
22 crafting the "Factual Background" section of this Order and its analysis has not relied on the
23 portions of the parties' submissions purporting to controvert an undisputed fact that fail to render
24 that fact genuinely in dispute.

25 However, due to the deficiencies of Plaintiff's reply and related submissions, the Court is
26 forced to treat certain of Defendants' arguments as unopposed.  This requires the Court to apply a
27 different standard in determining whether Defendants' motion should be granted with respect to
28 those claims.  When a summary judgment motion is unopposed, a district court must "determine

11

whether summary judgment is appropriate — that is, whether the moving party has shown itself to be entitled to judgment as a matter of law." *Leramo*, 2011 WL 2680837 at *8 (quoting *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3rd Cir. 1990)). A district court "cannot base the entry of summary judgment on the mere fact that the motion is unopposed, but, rather must consider the merits of the motion." *Id*. (quoting *United States v. One Piece of Real Property, etc.*, 363 F.3d 1099, 1101 (11th Cir. 2004)). A court "need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials." *Id*. (quoting *One Piece of Real Property*, 363 F.3d at 1101).

### B.    Disparate Treatment Claims

Defendants argue that summary judgment should be granted on Plaintiff's claim for racial discrimination under a disparate treatment theory based on the following: First, Plaintiff cannot make a *prima facie* case of disparate treatment from which a reasonable factfinder could infer that Defendant EDD's allegedly adverse employment actions against Plaintiff were taken because of Plaintiff's race. Second, even if Plaintiff could make a *prima facie* case, Defendant EDD has articulated a legitimate, non-discriminatory reason for its treatment of Plaintiff, and Plaintiff has identified no evidence properly before the Court that could permit a reasonable factfinder to conclude that this reason is pretext. (*See generally* ECF No. 50-1 at 15–23.)

Plaintiff argues that Defendant EDD's motion for summary judgment should be denied based on the following: First, Plaintiff has made a *prima facie* case of disparate treatment. Second, Defendant EDD's reasons for terminating Plaintiff are not worthy of credence, and Defendant EDD's true motivation was Plaintiff's race. (*See generally* ECF No. 58 at 3–10.)

#### i.    Title VII/FEHA Standard

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or national origin." 42 U.S.C. § 2000e-2(a)(1). FEHA uses largely the same language and promotes the same objective as Title VII. *See* Cal. Gov. Code § 12940(a); *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000); *Reno v. Baird*, 18 Cal. 4th 640, 647 (1998). As a

1   result, the Title VII framework is applied to claims brought under FEHA, including

2   discrimination claims brought under a disparate treatment theory.  *Metoyer v. Chassman*, 504

3   F.3d 919, 941 (9th Cir. 2007); *Guz*, 24 Cal. 4th at 354 ("In particular, California has adopted the

4   three-stage burden-shifting test established by the United States Supreme Court for … claims of

5   discrimination … based on a theory of disparate treatment").

6          A plaintiff bringing a Title VII or FEHA racial discrimination action under a theory of

7   disparate treatment must demonstrate at trial that his or her employer took one or more adverse

8   employment actions against the plaintiff because of the plaintiff's race.  *See Desert Palace, Inc. v.*

9   *Costa*, 539 U.S. 90, 92–93, 99–100 (2003); *Heard v. Lockheed Missiles & Space Co.*, 44 Cal.

10  App. 4th 1735, 1748 (1996).  An adverse employment action is one that "materially affect[s] the

11  compensation, terms, conditions, or privileges of ... employment."  *Davis v. Team Elec. Co.*, 520

12  F.3d 1080, 1089 (9th Cir. 2008); *see also Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1137

13  (2005) (stating "an adverse employment action must materially affect the terms and conditions, or

14  privileges of employment to be actionable" in the FEHA context).

15         A plaintiff may oppose a motion for summary judgment using direct or indirect evidence.

16  *McGinest*, 360 F.3d at 1122; *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 66–68

17  (2000).  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus

18  without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.

19  1998) (citation and internal quotation and editing marks omitted).

20         If an employer moving for summary judgment on a disparate treatment claim meets its

21  initial burden, "the plaintiff is presented with a choice regarding how to establish his or her case."

22  *McGinest*, 360 F.3d at 1122.  The plaintiff may proceed by using the burden-shifting framework

23  first set out in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973), or alternatively, may

24  produce direct or circumstantial evidence that a discriminatory reason motivated the defendant in

25  taking the challenged actions against the plaintiff.  *McGinest*, 360 F.3d at 1122; *see Heard*, 44

26  Cal. App. 4th at 1749 (indicating a FEHA disparate treatment plaintiff need not proceed under

27  *McDonnell Douglas* if the plaintiff has direct evidence).  The plaintiff retains the burden of

28  persuasion throughout whether or not the plaintiff chooses to use the *McDonnell Douglas*

13

1   framework.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Guz*, 24 Cal. 4th
2   at 356.

3          Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie*
4   case of racial discrimination.  The "requisite degree of proof necessary to establish a *prima facie*
5   case for Title VII ... claims on summary judgment is minimal and does not even need to rise to
6   the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th
7   Cir. 1994), *as amended on denial of reh'g* (July 14, 1994).  Once established, the *prima facie* case
8   creates a rebuttable "presumption that the employer unlawfully discriminated against the
9   employee."  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.2002) (quoting *Burdine*, 450 U.S. at
10  254).

11         A plaintiff may establish a *prima facie* case by showing: "(1) he was a member of a
12  protected class, (2) he was qualified for the position he sought or was performing competently in
13  the position he held, (3) he suffered an adverse employment action, such as termination,
14  demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory
15  motive." *Guz*, 24 Cal. 4th at 355; *see also Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603
16  (9th Cir. 2004) (setting forth substantially the same elements in the Title VII context).  Often the
17  fourth element is stated as "similarly situated individuals outside his protected class were treated
18  more favorably" or words to similar effect.  *See, e.g.*, *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*,
19  225 F.3d 1115, 1123 (9th Cir. 2000); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654,
20  658 (9th Cir. 2002).  But it need not be.  *See Guz*, 24 Cal. 4th at 355; *Peterson*, 358 F.3d at 603.

21         This shifts the "burden of production, but not persuasion, … to the employer to articulate
22  some legitimate, nondiscriminatory reason for the challenged action."  *Chuang*, 225 F.3d at
23  1123–24.  "To accomplish this, the defendant must clearly set forth, through the introduction of
24  admissible evidence, the reasons for" the challenged adverse employments actions.  *Lyons*, 307
25  F.3d at 1112 (quoting *Burdine*, 450 U.S. at 255).  Whether a defendant has met its burden of
26  production involves "no credibility assessment."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,
27  509 (1993).  "In other words, the factfinder's general duty to draw all reasonable inferences in
28  favor of the nonmovant does not require that the court make a credibility determination on the

                                        14

defendant's evidence at the summary judgment stage, even if it has reason to disbelieve that evidence." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

If the defendant meets this burden of production, any presumption that the defendant discriminated "drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507–11; *see also Guz*, 24 Cal. 4th at 356 (explaining that the presumption "disappears" at this point). At this point, plaintiff must be given the opportunity to demonstrate that the proffered reason or reasons were pretext for intentional discrimination. *Burdine*, 450 U.S. at 255–56; *Guz*, 24 Cal. 4th at 356.

The plaintiff may offer additional evidence to rebut the employer's offered reasons but the plaintiff is not necessarily required to produce evidence in addition to the evidence produced to establish the *prima facie* case. *Lyons*, 307 F.3d at 1112–13; *Chuang*, 225 F.3d at 1127. This is because a reasonable factfinder may infer "the ultimate fact of intentional discrimination" without additional proof once the plaintiff has made out his *prima facie* case if the factfinder believes that the employer's proffered nondiscriminatory reasons lack credibility. *Lyons*, 307 F.3d at 1112–13 (quoting *Reeves*, 530 U.S. at 147); *see also Chuang*, 225 F.3d at 1127 (same).

To establish that a defendant's nondiscriminatory explanation is a pretext for discrimination, a plaintiff may rely on circumstantial evidence or direct evidence or both. *See Chuang*, 225 F.3d at 1127. Typically, circumstantial evidence offered by a plaintiff to prove pretext will take one of two forms. *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005); *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003), *as amended* (Jan. 6, 2004). The plaintiff may "make an affirmative case that the employer is biased." *Coghlan*, 413 F.3d at 1095; *Stegall*, 350 F.3d at 1066 (describing the first option as "persuading the court that a discriminatory reason more likely motivated the employer"). Or, the plaintiff may "make his case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Coghlan,* 413 F.3d at 1095.

At this stage the ultimate task is for the district court to determine whether a reasonable factfinder could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action or actions because of the plaintiff's race after examining all of the evidence properly submitted irrespective of whether it was submitted in support of the *prima*

1    *facie* case or is characterized as direct or indirect.  *See Burdine*, 450 U.S. at 256 n. 10 ("In saying

2    that the presumption drops from the case, we do not imply that the trier of fact no longer may

3    consider evidence previously introduced by the plaintiff to establish a *prima facie case*.");

4    *Chuang*, 225 F.3d at 1127, 29 ("In this case, while the indirect evidence and direct evidence are

5    independently sufficient to allow the [plaintiffs] to proceed to trial, it is the cumulative evidence

6    to which a court ultimately looks."); *see also Cornwell v. Electra Cent. Credit Union*, 439 F.3d

7    1018, 1028 (9th Cir. 2006) ("If the defendant [satisfies the second *McDonnell Douglas* step], then

8    the presumption of discrimination drops out of the picture and the plaintiff may defeat summary

9    judgment by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P.

10   56(c).") (internal quotation marks omitted); *Wallis*, 26 F.3d at 889 (same).

11                          *ii.*       *Prima Facie Case Cannot Be Established*

12           Plaintiff's disparate treatment theory claim fails as a matter of law because Plaintiff has

13   failed to show that any adverse action was taken against him because of his race.  Plaintiff has not

14   proffered any direct evidence[6] of racial discrimination in his opposition to Defendant's motion

15   and proceeds under the *McDonnell Douglas* framework.  However, Plaintiff has not attempted to

16   show any similarly situated individuals outside his protected class were treated more favorably.

17   (*See* ECF No. 50 at 3–10.)  Therefore, the Court must see whether "other circumstances

18   surrounding the adverse employment action give rise to an inference of discrimination."

19   *Peterson*, 358 F.3d at 603.

20           Only the fourth element of the *prima facie* case is in dispute.[7]  For the sake of

21   completeness the Court will first briefly address the other factors as only the third of said factors

22   is partially contested by Defendant EDD.  There is no dispute that the first factor is satisfied

23   because Plaintiff is an African American.  Defendant EDD does not address the second factor in

---

[6]        The Court finds that Defendant has opposed the motion for summary judgment with respect to these claims.
Consequently, the Court applies the traditional summary judgment standard.  Plaintiff makes no mention of the
incident where Plaintiff alleges Derks angrily told him to sit in a one-on-one meeting in support of Plaintiff's
argument opposing summary judgment on his disparate treatment claims.  (*See* ECF No. 50 at 3–10.)  Even if the
Court applied the standard for an unopposed motion and considered this incident, it would not change the Court's
conclusion.  As the Court explains in more detail in resolving Plaintiff's racial harassment claims, being told angrily
to "sit" in a one-on-one meeting with a supervisor of a different race is not conduct of a "racial nature" without more.
[7]        Plaintiff does not explicitly address this under a separate sub-heading.  However, the Court has been able to
derive the thrust of Plaintiff's argument looking to Plaintiff's discussion of the other elements of a *prima facie* case.

16

1    its brief so for purposes of this motion only the Court assumes that Plaintiff was qualified for his

2    position.

3         Due in part to Defendant EDD's concession, and that the fourth factor so strongly favors

4    Defendant EDD,  as to the third factor the Court will treat the following as the adverse

5    employment actions at issue for Plaintiff's disparate treatment claims: Plaintiff's termination and

6    each of the three negative performance reports he received.[8]  Termination of employment

7    "certainly constitutes an adverse employment action."  *Aragon*, 292 F.3d at 660.  Similarly, "an

8    *undeserved* negative performance review" can constitute an adverse employment action.  *Brooks*

9    *v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (emphasis added); *see also Yanowitz*, 36

10   Cal 4th at 1053–54 (explaining that FEHA covers "the entire spectrum of employment actions

11   that are reasonably likely to adversely and materially affect an employee's job performance or

12   opportunity for advancement in his or her career").  For purposes of its motion for summary

13   judgment, Defendant EDD concedes these constitute adverse employment action for Plaintiff's

14   disparate treatment claims.  (ECF No. 50-1 at 16 (noting it does contend that the negative reports

15   were deserved).)

16        As to the fourth factor Plaintiff seems to allege that his white supervisor's complaints

17   about his job performance demonstrate a discriminatory motive.  Although not clearly stated, the

18   only evidence that Plaintiff offers in support of his claim that Defendant EDD took adverse

19   employment actions against him because of his race is his assertion that the first person to find

20   fault with his work was a supervisor of a different race than him.  (ECF No. 58 at 5 ("Between

21   January 4, 2010 and February 4, 2010, [Plaintiff] had not received any complaints nor been

22   counseled about his performance before David Derks, a white male, became [Plaintiff's] first line

23   supervisor.").)

24        The inference Plaintiff would have drawn from his assertion is as follows: it is reasonable

---

[8]    The Court found it difficult to discern what, if anything, the Plaintiff viewed as constituting "adverse
employment actions" suffered by him aside from his termination.  For example, Plaintiff's pretext argument is
captioned "EDD's Reason for Rejecting Pinder on Probation are [sic] Pretextual."  (ECF No. 58 at 9.)  However,
Plaintiff never mentions his termination in the section captioned "EDD Acted Adversely Against Plaintiff."  (ECF
No. 58 at 5–9.)  Plaintiff simply states in that section that he has suffered "an adverse action" without identifying it.
(ECF No. 58 at 5.)  This is followed by four pages of statements, including his negative performance reports, without
proper citation to the record or legal analysis.  (ECF No. 58 at 5–9.)

17

1  to infer that criticism of his work was based on his race because the first person to find fault with

2  his work was white.  However, Plaintiff's assertion is not supported by any evidence properly

3  before the Court, any citation to legal authority, or any legal analysis.  (*See* ECF No. 50 at 3–10.)

4  Plaintiff's own submissions to the Court and his deposition indicate that on January 18, 2010,

5  there was a disagreement between Plaintiff and Ken Lam[9] during an interview with a potential job

6  candidate.  (ECF No. 58-1 at 5; ECF No. 58-3 at ¶ 5; Pl.'s Dep., 40:3–44:5.)  Plaintiff attributes

7  this to jealousy on the part of Ken Lam who Plaintiff believes applied for the job that Plaintiff

8  was hired to fill.  (ECF No. 58-3 at ¶ 5; Pl.'s Dep., 42:20–25.)  Moreover, Plaintiff faulted Derks

9  for removing Plaintiff from interview panels based "on interviews in January, before Derks was

10  hired."  (ECF No. 58-1 at 5.)  Plaintiff testified that the January 18, 2010, interview was the only

11  interview he participated in as a panelist.  (Pl.'s Dep., 40:3–4.)  Therefore, Plaintiff has failed to

12  establish the factual predicate for the inference.  Moreover, Plaintiff's assertion ignores the

13  following facts: Plaintiff had no direct supervisor during the one month period cited and

14  dissatisfaction with Plaintiff's work persisted even after a person of the same race became his

15  direct supervisor.  (*See* ECF No. 58-1 at ¶ 46; ECF No. 60 at 4; Pl.'s Dep., 18:18–19.)

16        The Ninth Circuit has held the fact that a defendant of a different race than the plaintiff

17  made or was involved in making a decision that the plaintiff disagreed with, standing alone, does

18  not mean that plaintiff was "discriminated on the basis of race" in the Section 1983 context.  *See*

19  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) ("[T]he fact that Mrs.

20  Thornton is Native American and certain City council members and administrators are not,

21  standing alone, does not mean that Defendants have discriminated on the basis of race");

22  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948–49 (9th Cir. 2003) (disagreeing with the

23  proposition "that because [plaintiff] is African-American, the officer is white, and they disagree

24  about the reasonableness of the traffic stop, these circumstances are sufficient to raise an

25  inference of racial discrimination"), *abrogated on other grounds by Virginia v. Moore*, 553 U.S.

26  164 (2008), *as recognized in Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 956 n. 14

27  (9th Cir. 2010).  This does not change simply because the plaintiff subjectively thinks it to be

28

---

[9]     In certain places in the submissions the name "Kin Lam" is also used.  (*See, e.g.,* ECF No. 58-3 at ¶ 6.)

true.  *See Thornton*, 425 F.3d at 1167 (explaining that "conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment").

Plaintiff's citation to Third Circuit cases (unaccompanied by legal analysis) is not to the contrary.  For example, in *Coulton v. University of Pennsylvania*, No. 06-2417, 2007 WL 1881007 (3rd Cir. July 2, 2007), the plaintiff, who was white, noted that the initial decision to discharge him was "made by an African-American supervisor" and was "upheld by an African-American University Vice President."  *Id*. at *6.  The Third Circuit held that "[t]he mere fact that [these decision makers] were of a different race than [the plaintiff] … is insufficient to permit an inference of discrimination."  *Id*. (citing *Iadimarco v. Runyon*, 190 F.3d 151, 156 (3rd Cir. 1999)).  This appears to be the uniform position of federal courts that have considered this issue in the Title VII context.  *E.g., Holdmeyer v. Veneman*, 321 F. Supp. 2d 374, 382 (D. Conn. 2004) ("Plaintiff fails to raise an inference of discrimination with respect to the denial of his grievance.  The only evidence he offers is the fact that the decision maker is of a different race than he is."), *aff'd sub nom. Holdmeyer v. Dep't of Agric.*, 146 F. App'x 535 (2d Cir. 2005); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000) ("[Plaintiff], however, has shown nothing more than a routine difference of opinion and personality conflict with her supervisor.  [W]e refuse to transmute such ordinary workplace disagreements between individuals of different races into actionable race discrimination…."), *cert denied*, 531 U.S. 875 (2002); *Rivas Rosado v. Radio Shack, Inc*., 312 F.3d 532, 534 (1st Cir. 2002) (concluding the same is true in sex discrimination under Title VII where the plaintiff and alleged discriminator are different sexes).  In sum based on the foregoing, Plaintiff has failed to allege circumstances suggesting discriminatory motive.

### iii.    Insufficient showing of pretext

Even if Plaintiff could make a *prima facie* case, Defendant EDD argues it has articulated a legitimate, non-discriminatory reason for its treatment of Plaintiff.  On this point, the Court notes that Plaintiff has identified no evidence properly before the Court that could permit a reasonable finder of fact to conclude that this reason is pretext for racial discrimination.  Defendant EDD states that its challenged actions were taken due to months of "unsatisfactory" job performance by the Plaintiff.  (ECF No. 50-1 at 21.)  The Ninth Circuit has held "poor job performance ….

constitute[s] a legitimate, nondiscriminatory reason" for taking an adverse employment action. *Aragon*, 292 F.3d at 661.  Defendant EDD has identified ample admissible evidence in support of its position, and has therefore met its burden of production.  (ECF No. 50-1 at 21–23.)

Plaintiff's arguments that Defendant EDD's proffered reason is unworthy of credence and that its real reason was Plaintiff's race are largely conclusory statements with little legal analysis or support.  For example, Plaintiff asserts that "EDD's explanation is weak, implausible, inconsistent, incoherent and contradicted" and that Derks and Rogers are "unworthy" of being believed.  (ECF No. 58-1 at 7.)  Conclusory statements of Plaintiff's subjective belief are insufficient to demonstrate pretext.  *See Wallis*, 26 F.3d at 890 ("[The plaintiff] must do more than establish a *prima facie* case and deny the credibility of the [defendant's] witnesses."); *Moore v. California Dep't of Corr. & Rehab.*, 1:10-cv-1165 LJO SMS, 2012 WL 5288785, at *10 (E.D. Cal. Oct. 24, 2012) (A "plaintiff cannot create a genuine issue of pretext to survive a motion for summary judgment by relying solely on unsupported speculations and allegations of discriminatory intent.").  Moreover, the evidence properly before the Court reflects Plaintiff's supervisors consistently and coherently disapproved of Plaintiff's work quality based on discrete, particular instances of perceived underperformance that do not contradict each other.  These particular instances of perceived underperformance became evident almost immediately after each supervisor began working with Plaintiff.  (*See* ECF No. 50-1 at 21–23.)

The remainder of Plaintiff's argument seems to suggest that Plaintiff's disagreement with the substance of the evaluations by Derks and Rogers, and the quality and style of their management, show Defendant EDD's articulated reasons are pretext.  (*See* ECF No. 58 at 9–10.) Plaintiff states "Rogers gave [Plaintiff] an interim probationary performance evaluation with an overall rating of unacceptable.  But, Rogers was not aware of [Plaintiff's] ability to get along with others."  (ECF No. 58 at 9.)  Plaintiff also appears to have been displeased that only Rogers was present during Plaintiff's December 2, 2010, interim report without citing any evidence to demonstrate this was improper or even unexpected.  (*See* ECF No. 58 at 10; *compare, e.g.*, Pl.'s Dep. 107:6–17 (describing being called into Derks office and presented with Plaintiff's first probationary report without suggesting any other persons were present).)  Additionally, he

20

1   mentions that Derks held weekly one-on-one meetings with Pinder to "discuss essential job

2   duties." (ECF No. 58 at 9.)

3       None of these assertions are evidence from which a reasonable factfinder could infer that

4   Defendant EDD's proffered explanations are pretext for racial discrimination.  Plaintiff's

5   disagreement with the substance of performance evaluations and the quality and style of his

6   supervisors, even if made in good faith, simply are not the wrongs that Title VII and FEHA

7   address.  *See, e.g., Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1214 n.7 (9th Cir. 2008);

8   *Hawkins*, 203 F.3d at 276.  Title VII and FEHA do not ask factfinders to determine whether an

9   employer is good at finding the talent in its ranks or whether evaluations of its employees always

10  correct or even "fair" in some abstract sense.  *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595,

11  602 (9th Cir. 1993).  Neither do they seek to ensure that employees are never dissatisfied with the

12  management style of their supervisors.  *See Hawkins*, 203 F.3d at 282; *Shanks v. Abbot Labs.*, No.

13  5:15-cv-01151-EJD, 2016 WL 3940923, at *8 (N.D. Cal. July 21, 2016).  They seek to smoke out

14  whether challenged employment actions were unlawfully motivated by certain prohibited factors,

15  e.g., the race of the employees.  *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102,

16  1112 n.7 (2007).

17      For these reasons Defendants' motion for summary judgment on Plaintiff's claims for

18  racial discrimination under a disparate treatment theory is GRANTED.

19              C.    Harassment/Hostile Work Environment Claim

20      Defendants[10] argue that summary judgment should be granted on Plaintiff's

21  harassment/hostile work environment claim[11] based on the following: First, the alleged

22  harassment was supervisory in nature and therefore does not constitute harassment as a matter of

23  law.  Second, Plaintiff has identified no evidence properly before the Court that could permit a

24  reasonable finder to conclude that any of the allegedly harassing conduct was based on Plaintiff's

25  _____

26  [10]    The Court previously dismissed Plaintiff's Title VII harassment claims against Derks and Rogers.  (ECF No.
    19 at 34.)

27  [11]    The parties use the terms "hostile work environment" and "harassment" to describe the same claim.  This
    Court has previously noted that the "terms 'hostile work environment' and 'harassment' may be used interchangeably
    in that the elements of a claim under either label are the same.  *Al-Raheem v. Covenant Care*, No. 1:10-2064 AWI

28  GSA, 2011 WL 4628698, at *3 (E.D. Cal. Oct. 3, 2011).  The Court does so here.

1    race.  (ECF No. 50-1 at 23–25.)

2        Plaintiff argues[12] that Defendants' motion for summary judgment on this claim should be

3    denied based on the following: Plaintiff has submitted evidence that could permit a reasonable

4    factfinder to conclude that Plaintiff established elements of a racial harassment claim; and

5    Defendant EDD did not adequately respond to the alleged harassment.  (*See* ECF No. 58 at 12–

6    14.)

7                           i.      *Title VII/FEHA Standard*

8        Title VII's prohibition on racial discrimination encompasses not only claims for disparate

9    treatment based on race, but also provides a claim for the creation of a hostile work environment,

10   which violates the guarantee of "the right to work in an environment free from discriminatory

11   intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *see*

12   *also Woods v. Graphic Communications*, 925 F.2d 1195, 1200 (9th Cir. 1991) ("Courts have long

13   recognized that a workplace in which racial hostility is pervasive constitutes a form of

14   discrimination.").

15       Under the FEHA, harassment and discrimination fall under separate statutory prohibitions.

16   *See* Cal. Gov. Code § 12940(a), (j)(1).  Consequently, California courts have distinguished

17   harassing acts from discriminatory acts.  *Reno*, 18 Cal. 4th at 645–47.  Harassing acts constitute

18   "conduct outside the scope of necessary job performance ... presumably engaged in for personal

19   gratification, because of meanness or bigotry, or for other personal motives."  *Id*. at 646.

20   Discriminatory acts "arise out of the performance of necessary personnel management duties."

21   *Id*. at 647.  However, the California Supreme Court has stated that "some official employment

22   actions done in furtherance of a supervisor's managerial role can also have a secondary effect of

23   _____

24   [12]      The Court has measured this portion of Defendants' motion under the traditional summary judgment
     standard.  Plaintiff more or less recites the elements of this claim, albeit citing to Seventh Circuit cases, and captions
25   sub-headings with each element, e.g., "Plaintiff's Harassment Complained of Was Based on His Race."  (ECF No. 58
     at 12.)  Beneath these captions follow nearly two pages of statements without proper citation to the record.  While the
26   legal analysis is sparse, the Court is able to discern the thrust of Plaintiff's opposition.  Nevertheless, the Court notes
     that had it measured this portion of Plaintiff's opposition under the standard for when a motion for summary
27   judgment is not meaningfully opposed, the outcome would be the same as Defendants are entitled to judgment as a
     matter of law on this claim.  Additionally, the only piece of evidence not raised by Plaintiff that the Court would have
28   independently considered has already been addressed, i.e., the incident where Plaintiff was angrily told to sit by
     Derks.

                                         22

communicating a hostile message." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 709 (2009), *as modified* (Feb. 10, 2010).  Therefore, discriminatory acts can provide "evidentiary support for a harassment claim …." *Id.*

Despite this distinction, the elements that a plaintiff must show on a hostile work environment claim based on race are the same under Title VII and FEHA: (1) that he was subjected to verbal or physical conduct because of his race; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  *Manatt v. Bank of America, NA*, 339 F.3d 792, 798 (9th Cir. 2003); *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 265, 279 (2006); *Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 876 (2010).  The working environment must be both subjectively and objectively perceived as abusive.  *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995); *Haberman v. Cengage Learning, Inc.*, 180 Cal. App. 4th 365, 379 (2009).  Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.  *Fuller*, 47 F.3d at 1527; *Thompson*, 186 Cal. App. 4th at 877.  This is determined looking at the totality of the circumstances.  *Gathenji v. Autozoners, LLC*, 703 F. Supp. 2d 1017, 1032 (E.D. Cal. 2010); *Hughes v. Pair*, 46 Cal. 4th 1035, 1044 (2009).

FEHA and Title VII differ on whether liability may be imposed on individual defendants and the circumstances under which it may be imposed on the employer.  FEHA contains "clear language imposing personal liability on all employees for their own harassing actions." *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158, 1162 (2008).  The Ninth Circuit has held that individual defendants may not be held personally liable under Title VII for their own harassing behavior.  *See Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

Under FEHA, whether an employer is liable for a racially hostile work environment depends on whether its harassing employees were the plaintiff's supervisors or co-workers.  "When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions." *Roby*, 47 Cal. 4th at 707.  "When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence (that is, the employer knew or should have known of the

23

1    harassment and failed to take appropriate corrective action)."  *Id.*

2          Under Title VII, whether an employer is liable for a racially hostile work environment

3    also depends on whether its harassing employees were the plaintiff's supervisors or co-workers.

4    *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  "If the harassing employee is the

5    victim's co-worker, the employer is liable only if it was negligent in controlling working

6    conditions."  *Id.*  If the harassing employee is the victim's supervisor, the employer is "strictly

7    liable" if the harassment culminates in a "tangible employment action."  *Id.*  Otherwise, the

8    employer may escape liability by establishing, as an affirmative defense, that "(1) the employer

9    exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff

10   unreasonably failed to take advantage of the preventive or corrective opportunities that the

11   employer provided."  *Id.*

12                    *ii.       Alleged Harassing Behavior Not Based On Race*

13         Defendants are entitled to judgment as a matter of law on Plaintiff's harassment claim

14   because there is simply no evidence properly before the Court that Plaintiff was subjected to any

15   alleged harassment because of his race.  Plaintiff seems to suggest that criticism from a supervisor

16   of a different race constitutes racial harassment without more.  (*See* ECF No. 58 at 12 ("Derks is a

17   white male.  And between January 4, 2010 and February, 4, 2010 before Derks became

18   [Plaintiff's] supervisor, no team member complained about [Plaintiff's] performance.").)  The

19   Court will also consider what appears to be the only incident that Plaintiff characterized as being

20   a "racial comment."  (*See* ECN No. 50-1 at 24.)

21         The Court rejects Plaintiff's argument that race-neutral criticism by a supervisor is

22   transformed into racial harassment simply because the first supervisor to find fault with his work

23   is not of Plaintiff's race.  As previously noted in the context of Plaintiff's disparate theory

24   argument, this assertion is misleading and not in its proper context as it ignores both the fact that

25   Plaintiff had no direct supervisor during this time frame and that Rogers, who is African

26   American, found Plaintiff's work quality unacceptably low when he became Plaintiff's direct

27   supervisor.  (*See* ECF No. 58-1 at ¶ 46; ECF No. 60 at 4; Pl.'s Dep., 18:18–19.)

28         Even so, the test for whether a plaintiff has been subject to racial harassment is whether

                                                 24

1   the allegedly harassing behavior is based on race not whether the alleged perpetrator of the

2   harassment is of a different race from the plaintiff.  *See Kang v. U. Lim America, Inc.*, 296 F.3d

3   810, 817 (9th Cir. 2002) (reversing the district court's order granting summary judgment in favor

4   of defendant on plaintiff's Title VII national original harassment claim where both the plaintiff

5   and the alleged harasser were of Korean descent).  This is ably illustrated by the analysis of the

6   Ninth Circuit in *Sheikh-Hassan v. United Airlines, Inc.*, No. 98-15114, 1999 WL 137336 at *5–7

7   (9th Cir. 1999).  There the Ninth Circuit affirmed the district court's order granting summary

8   judgment on the plaintiff's Title VII harassment claim.  *Id*.  The Ninth Circuit determined an

9   incident where a co-worker called the plaintiff "illiterate" and allegations that the plaintiff's

10   supervisor "check[ed] on [him] when he went on his breaks" were not based on race.  *Id*.

11   Therefore, they were not included in the Ninth Circuit's analysis of whether the alleged use of a

12   racial slur against the plaintiff in an anonymous note was "sufficient to create a Title VII

13   violation." *Id*.

14           As the Court has previously noted, the only incident that Plaintiff has apparently

15   characterized as being a racial comment was when Derks told him to sit.  (*See* ECN No. 50-1 at

16   24.)  Being told angrily to "sit" in a one-on-one meeting with a supervisor is not conduct of a

17   "racial nature" without more.  The Court has been able to locate three instances where a plaintiff

18   alleging racial harassment cited an instance of being told to sit in an arguably offensive way by a

19   person of a different race, two of which involved speakers who were characterized as the

20   plaintiff's supervisor.  *See e.g., Roberts v. Associated Wholesale Grocers, Inc.*, No. CIV A 92-

21   2298-EEO, 1993 WL 390378, at *7 (D. Kan., Sept. 15, 1993) (involving supervisor repeatedly

22   yelling "sit" during discussion about plaintiff's job performance), *aff'd*, 37 F.3d 1510 (10th Cir.

23   1994); *Rayburn-Duitman v. S. Bend Tribune, Corp.*, No. 3:97-CV-506 RM, 2000 WL 552539, at

24   *4 (N.D. Ind. Jan. 20, 2000) (involving co-workers telling plaintiff to "sit down and shut up");

25   *Singh v. U.S. House of Representatives,* 300 F. Supp. 2d 48, 54 (D.D.C. 2004) (involving

26   supervisor telling the plaintiff "to shut up and sit down" during one-on-one meeting when the

27   plaintiff asked to be excused).  In each instance the district court concluded the conduct was not

28   of race based.  *Roberts*, 1993 WL 390378 at *7; *Singh*, 300 F. Supp. 2d at 57; *Rayburn-Duitman*,

1    2000 WL 552539 at *4.  Plaintiff's brief description of the incident is essentially

2    indistinguishable from *Roberts* and *Singh*.  The Court is persuaded by the analysis of these

3    opinions and finds that this incident cannot be objectively viewed as being racial in nature.

4         Even if this incident could be viewed as being of a "racial nature," the Court notes that the

5    Ninth Circuit has affirmed grants of summary judgment to defendants where the plaintiffs were

6    subjected to conduct that was overtly racially related and much more severe and pervasive than

7    the conduct alleged herein.  *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir.

8    2003), 349 F.3d at 643 (both the facts of that case and those of the cases to which it was

9    compared); *Manatt*, 339 F.3d at 799 (same).  The Seventh Circuit Title VII harassment case cited

10   by Plaintiff is not to the contrary.  *Porter v. City of Chica*go, 700 F.3d 944, 956 (7th Cir. 2012)

11   (finding that even if the court assumed that the four specific instances of alleged harassment

12   identified by Plaintiff, including "being told to sit down in a 'high-pitched voice' by her

13   supervisor," were based on her religion, these were "not severe or pervasive enough to fall within

14   Title VII's purview").

15        For these reasons Defendants' motion for summary judgment on Plaintiff's claim for

16   racial harassment/hostile work environment is GRANTED.

17                     D.      Retaliation Claims

18        Defendants argue that summary judgment should be granted on Plaintiff's retaliation

19   claims based on the following: First, Plaintiff's complaining to EDD's mediation office and filing

20   a complaint with EDD's EEO Office do not constitute protected activities necessary to make a

21   *prima facie* case of retaliation.  Second, Plaintiff cannot establish a causal link between his

22   alleged protected activities and any adverse employment action.  Third, even if Plaintiff made a

23   *prima facie* case, Defendant EDD has articulated a legitimate, non-retaliatory reason for its

24   treatment of Plaintiff, and Plaintiff has identified no evidence properly before the Court that could

25   permit a reasonable factfinder to conclude that this reason is a pretext for retaliation.  (ECF No.

26   50-1 at 27–29.)

27        Plaintiff argues[13] that Defendants' motion for summary judgment on this claim should be

---

28   [13]      The Court finds that Plaintiff has opposed the motion for summary judgment with respect to these claims.

1    denied because Plaintiff has a made *prima facie* case of retaliation from which the Court can infer

2    that Defendant EDD's allegedly adverse employment actions against Plaintiff were retaliatory.

3    (ECF No. 58 at 10–12.)  The Court notes that Plaintiff does not directly address Defendants'

4    pretext argument.  (*See* ECF No. 58 at 10–12.)

5                    i.      *Title VII/FEHA/Cal. Labor Code Standard*

6            A plaintiff opposing a motion for summary judgment on retaliation claims under Title VII,

7    FEHA and §§ 98.6 and 1102.5 of the California Labor Code may use the *McDonnell Douglas*

8    burden shifting framework.  *McGinest*, 360 F.3d at 1124 (setting out the standard for Title VII);

9    *Moore v. Regents of the Univ. of Cal.*, 248 Cal. App. 4th 216, 244 (2016) (setting out the standard

10   for FEHA); *Muniz v. United Parcel Serv., Inc.*, 731 F. Supp. 2d 961, 969 (N.D. Cal. 2010)

11   (setting out the standard for retaliation claims under Cal. Labor Code §§ 98.6 and 1102.5).

12           To make out a *prima facie* case of retaliation, a plaintiff must point to sufficient evidence

13   to permit a reasonable factfinder to conclude that (1) he engaged in a protected activity, (2) he

14   suffered an adverse employment action, and (3) there was a causal link between his activity and

15   the employment decision.  *McGinest*, 360 F.3d at 1124; *Moore*, 248 Cal. App. 4th at 244.  To

16   constitute protected activity, a complaint must be based on an employee's "reasonable belief that

17   the employer has engaged in an unlawful employment practice."  *Freitag v. Ayers*, 468 F.3d 528,

18   541–42 (9th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007); *see also Yanowitz*, 36 Cal. 4th at

19   1043 & n.4 (explaining that the employee must "reasonably believe" he is opposing

20   discriminatory conduct even if he proves to be incorrect).  Under Title VII, an adverse action for a

21   retaliation claim is one that could "dissuade[ ] a reasonable worker from making or supporting a

22   charge of discrimination."  *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006).

23   FEHA differs slightly, requiring the same standard as a discrimination claim: an adverse action

24   "must materially affect the terms, conditions, or privileges of employment."  *Yanowitz*, 36 Cal.

---

25   Consequently, the Court applies the traditional summary judgment standard.  Plaintiff more or less recites the
26   elements of a *prima facie* case of retaliation, albeit citing to Third Circuit cases, and captions sub-headings with each
     element, *e.g.*, "Plaintiff Engaged in a Protected Employee Activity."  (ECF No. 58 at 10–12.)  Beneath these captions
27   follow nearly two pages of statements without proper citation to the record.  While the legal analysis is sparse, the
     Court is able to discern the thrust of Plaintiff's opposition.  Nevertheless, the Court notes that had it measured this
28   portion of Defendants' motion under the standard for when a motion for summary judgment is not meaningfully
     opposed, the outcome would be the same as Defendants are entitled to judgment as a matter of law on this claim.

1    4th at 1052.

2         The causation required for the third element may be "inferred from timing alone where an

3    adverse employment action follows on the heels of protected activity." *Davis*, 520 F.3d at 1094;

4    *Loggins*, 151 Cal. App. 4th at 1112–13 (same for FEHA).  "Essential to a causal link is evidence

5    that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v.*

6    *Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982); *see also Morgan*, 88 Cal. App. 4th at 70

7    (same for FEHA).  This requires evidence from which a reasonable factfinder can infer the

8    decision maker (or at least one of them if more than one) in the challenged action was aware of

9    the protected activity.  *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197

10   (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir.

11   May 8, 2003); *Morgan*, 88 Cal. App. 4th at 73; *see also Cohen*, 686 F.2d at 797 n.5 ("There is no

12   evidence that any company official or employee who had knowledge of [the plaintiff's] complaint

13   had any part in the policy decision.")

14        As with disparate treatment cases, once the *prima facie* case is established, the burden of

15   production shifts to the employer to present a legitimate, non-retaliatory reason for the adverse

16   employment action.  *McGinest*, 360 F.3d at 1124; *Loggins*, 151 Cal. App. 4th at 1112.  If the

17   employer carries this burden, a plaintiff must demonstrate a genuine issue of material fact as to

18   whether the reason advanced by the employer is pretext for retaliation.  *Brooks*, 229 F.3d at 928;

19   *see Loggins*, 151 Cal. App. 4th at 1112.  The Ninth Circuit has determined that "[i]n some cases,

20   temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for

21   purposes of both the *prima facie* case and the showing of pretext." *Dawson v. Entek Intern.*, 630

22   F.3d 928, 937 (9th Cir. 2011).  However, under FEHA, temporal proximity is not sufficient to

23   show pretext without more.  *Loggins*, 151 Cal. App. 4th at 1112.

24                    *ii.     The Court Assumes Prima Facie Case Satisfied*

25        The Court assumes that Plaintiff can satisfy the elements of a *prima facie* case of

26   retaliation.  While the Court has concluded for the reasons set forth in this Order that Plaintiff's

27   racial disparate treatment and harassment claims fail as a matter of law, the Court assumes for the

28   purpose of this motion that Plaintiff reasonably believed in good faith that he was reporting

                                                    28

1   activity that violated FEHA, Title VII, or both when he filed his May 27, 2010[14] complaint with

2   EDD's EEO Office and therefore Plaintiff's complaint constitutes a protected activity satisfying

3   the first element of a *prima facie* case for each of the retaliation claims.  However, Defendant

4   EDD is entitled to summary judgment on Plaintiff's retaliation claims because there is insufficient

5   evidence properly before the Court from which a reasonable jury could conclude that the

6   legitimate, non-retaliatory explanation offered by Defendant EDD for terminating Plaintiff was a

7   pretext for retaliation.

8          Defendants do not contest that Plaintiff's rejection from probation could constitute an

9   adverse employment action for purposes of Plaintiff's *prima facie* case.  However, for purposes

10  of this motion only the Court assumes that Plaintiff's second and third negative job performance

11  reports are also adverse employment actions.[15]

12         The Court assumes that the third element of the *facie case* is satisfied due to the temporal

13  proximity between Plaintiff's EEO complaint and each of Plaintiff's second and third negative

14  probationary reports and his termination.  Defendants have quoted *Arteaga* and Fifth Circuit case

15  law for the proposition that timing is never sufficient on its own to satisfy the third element.

16  (ECF No. 50-1 at 28–29.)  However, this quotation of *Arteaga* is discussing the pretext stage.

17  Earlier in this same opinion it is stated that "… temporal proximity, by itself, *may be sufficient to*

18  *establish a prima facie case of … retaliation*…."  *Arteaga*, 163 Cal. App. 4th at 334 (emphasis

19  added).  Additionally, this Court is not free to ignore the Ninth Circuit's binding precedent

20  irrespective of the Fifth Circuit's view.

21                        *iii.     Insufficient Showing of Pretext*

22         Defendant EDD has articulated a legitimate, non-retaliatory reason for all of the alleged

---

23  [14]       As noted in footnote 5, the record is confusing as to what Plaintiff might have done prior to filing his May

24  27, 2010 claim.  Defendants argue that Plaintiff has not shown that his contacting of the mediation office constitutes
    a protected activity.  (ECF No. 50-1 at 27.)  Plaintiff's opposition makes no mention of this or any pre-May 27, 2010,

25  EEO Office complaint in connection with his retaliation claim.  (*See* ECF No. 58 at 10.)  Even assuming that any of
    Plaintiff's pre-May 27, 2010, activity constitutes a protected activity, there is no evidence properly before the Court

26  that any decision maker, i.e., Derks or Rogers, became aware of this activity.  (*See* Pl.'s Dep., 75:3-85:13.)  Thus,
    inclusion of these events would not change the outcome.

27  [15]       It is not clear whether this argument is appropriately before the Court.  The First Amendment Complaint
    specifically identifies Plaintiff's termination as being the act taken by Defendant EDD as retaliation.  (ECF No. 8 at

28  14, 16.)  Arguably the complaint would need to be amended to consider Plaintiff's argument in his opposition.  *See*
    *Ward v. Clark Cty.*, No. 06-16990, 2008 WL 2699913, at *1 (9th Cir., July 9, 2008).

1    adverse employment actions at issue for Plaintiff's retaliation claims.  Defendant EDD states that

2    its challenged actions were taken due to months of "unsatisfactory" job performance by Plaintiff.

3    (ECF No. 50-1 at 21, 29.)  Poor job performance constitutes a legitimate, non-retaliatory reason

4    for taking an adverse employment action.  *See Aragon*, 292 F.3d at 661.  Defendant EDD has

5    identified ample admissible evidence to support this.  (ECF No. 50-1 at 21–23, 29.)  Defendant

6    EDD has therefore met its burden of production.

7          Although Plaintiff fails to address Defendant EDD's pretext argument directly, the Court

8    construes Plaintiff to rely on its temporal proximity argument.  (*See* ECF No. 58 at 10–12.)  To

9    the extent this renders Defendants' motion functionally unopposed on this point, the Court has

10   satisfied itself that there is insufficient evidence properly before the Court from which a

11   reasonable factfinder could conclude that Defendant EDD's reason for its allegedly adverse

12   employment actions was pretext.  For purposes of analyzing pretext, both the Ninth Circuit and

13   California precedent permit consideration of temporal proximity where there is other evidence to

14   support a conclusion of pretext.  *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir.

15   2003); *Diego v. Pilgrim United Church of Christ*, 231 Cal. App. 4th 913, 932 (2014).  The Court

16   has examined the parties' submissions to determine whether there is any evidence aside from

17   temporal proximity properly before the Court.

18         The only other evidence that can reasonably be considered is Plaintiff's allegation made in

19   his deposition that Rogers was "upset" after receiving an email from Plaintiff on the evening of

20   August 23, 2010, that complained of Derks's behavior in a one-on-one meeting and copied the

21   DIR mediator from the June meeting with Plaintiff, Rogers, and Derks.  (Pl.'s Dep., 87:25–

22   89:24.)  This evidence is insufficient.  When taken in context, inclusion of such evidence

23   arguably further supports Defendants' proffered reason.  It is undisputed that Rogers told Plaintiff

24   the next day that the one-on-one meetings between Derks and Plaintiff would end, and that

25   Plaintiff would report directly to Rogers, who officially became Plaintiff's immediate supervisor

26   on or about August 30, 2010.  (ECF No. 58-1 at ¶¶ 33–34; Pl.'s Dep., 87:25–89:24.)

27         For purposes of examining temporal proximity, the Court assumes Derks and Rogers first

28   became aware of Plaintiff's complaint to EDD's EEO Office on June 23, 2010, during the

1   meetings with the DIR mediator.  This seems to be the thrust of Plaintiff's argument and there is

2   no evidence properly before the Court to the contrary.  (*See* ECF No. 58 at 10–12; Pl.'s Dep.,

3   75:3–85:13.)  Moreover, this benefits Plaintiff as this lessens the time between their knowledge

4   and Plaintiff's second probationary report which Plaintiff received on or about September 10,

5   2010.  (*See* ECF No. 58-1 at ¶ 36.)

6        The Court finds the temporal proximity taken together with all other evidence of pretext

7   properly before the Court to be insufficient to create a genuine issue of material fact and that

8   Defendant EDD is entitled to judgment as a matter of law on each of the retaliation claims.  The

9   temporal proximity between June 23, 2010, and the alleged adverse employment actions, whether

10  looked at individually or collectively, does not support an inference that Defendant EDD's

11  proffered reason was a pretext for an improper retaliatory motive.  The Ninth Circuit has made

12  clear that "[t]here is no set time beyond which acts cannot support an inference of retaliation, and

13  there is no set time within which acts necessarily support" such an inference.  *Coszalter*, 320 F.3d

14  at 978.  Where there is any additional evidence, as the Court has assumed here, the district court

15  at the summary judgment stage examines "in the light of timing and the surrounding

16  circumstances" whether the challenged adverse action is "intended to be retaliatory."  *Id.*; *see also*

17  *Diego*, 231 Cal. App. 4th at 932 (explaining the same is true under FEHA).

18       A plaintiff's job performance and behavior is properly included as a surrounding

19  circumstance in determining pretext where the plaintiff's primary evidence is temporal proximity.

20  *E.g.*, *Davenport v. Bd. of Trs. of State Ctr. Cmty. Coll. Dist.*, 654 F. Supp. 2d 1073, 1094–95,

21  1101 (E.D. Cal. 2009) (examining in detail the plaintiff's behavior problems at work preceding

22  his suspension and subsequent protected activity at the pretext stage even where these had not

23  lead to a formal negative performance review).  This can cut both ways.  *See, e.g.*, *Diego*, 231

24  Cal. App. 4th at 932 (finding plaintiff's ten year tenure with little or no job performance issues

25  whose termination followed within a week of the protected activity had proffered sufficient

26  evidence to survive summary judgment).  Where "gradual adverse job actions began well before

27  the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

28  *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (cited with approval

in *Bower v. City & Cty. of San Francisco*, No. C 09-03507 CRB, 2011 WL 569882, at *8 (N.D. Cal. Feb. 14, 2011), *aff'd*, 2012 WL 2951416 (9th Cir. July 20, 2012)); *see also Mitchell v. Superior Court of Cal. Cty. of San Mateo*, No. 07–16309, 2009 WL 424578, at *1 (9th Cir. Feb. 20, 2009) (noting that the plaintiff had "not offered any evidence other than the 'timing' to rebut what otherwise appears to be an effort by an employer to confront ballooning discoveries regarding an employee's inappropriate behavior"); *cf. Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (explaining that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

The undisputed evidence offered in support of Defendant EDD's proffered non-retaliatory basis for its adverse actions is substantial.  Prior to any alleged protected activity there were gradual adverse job actions taken due to the perception that Plaintiff was not performing his job up to expectations:  First, Plaintiff was removed from interview panels in February 2010.  (ECF No. 58-1 at ¶ 14; Pl.'s Dep., 40:3–44:5.)  Second, Plaintiff was informed on May 7, 2010, that his immediate supervisor was "disappointed" in data received from Plaintiff because that supervisor viewed it as "incomplete."  (ECF No. 58-1 at ¶ 15; ECF No. 50-4 at ¶ 10.)  Third, certain of Plaintiff's procurement responsibilities were removed on May 11, 2010.  (ECF No. 58-1 at ¶ 16.) Fourth, Plaintiff's immediate supervisor told him on a near daily basis that Plaintiff's work product was below expectation beginning seemingly in February.  (Pl.'s Dep., 54:16–18, 60:6–9, 69:10–11.)  Finally, Plaintiff received a formal probationary report with an overall rating of "unacceptable."  (ECF No. 58-1 at ¶ 19.)

After receiving his first report and the June 23, 2010, meeting with the mediator, but before his second report, Plaintiff admitted doing a variety of things that would reinforce a negative perception of his job performance with his supervisors:  Plaintiff missed a meeting concerning Plaintiff's team's workload that was attended by Derks, Rogers, and all System Software Specialist III staff, except Plaintiff, without providing any explanation.  (ECF No. 58-1 at ¶ 27.)  Plaintiff turned in a status report that he admits his immediate supervisor spent three hours revising because the supervisor viewed it as not meeting expectations.  (ECF No. 58-1 at ¶

29.)  Plaintiff declined project management overview training.  (ECF No. 58-1 at ¶ 30.)

During his one-on-one meetings with Derks, all of which took part prior to this second report, Plaintiff also admitted doing a variety of things that would reinforce a negative perception of his job performance with his supervisors: For example, Plaintiff had difficulty making his staff input their contact information in a database.  (Pl.'s Dep., 55:3–13.)  Plaintiff also had difficulty making his staff provide status updates on their work assignments.  (Pl.'s Dep., 55:14–56:3.)  Due to Plaintiff's inability to recall dates in his deposition it is unclear whether these occurred before June 23, 2010.  Regardless, these admissions bolster Defendants' argument that Plaintiff's second report was (or all of the adverse actions collectively) not due to retaliatory intent.

The undisputed facts show things did not improve after Plaintiff's second report.  It took Plaintiff approximately ten days after Rogers's follow-up request to provide a rebuttal to Plaintiff's second probationary report.  (ECF No. 58-1 at ¶ 40.)  Plaintiff admits emailing Rogers that he would not attend a mandatory manager/supervisor meeting.  (ECF No. 58-1 at ¶ 41.)  Moreover, Plaintiff admits failing to meet deadlines Rogers set at least twice.  (ECF No. 58-1 at ¶¶ 43–45.)

When viewed in light of all the circumstances, including Plaintiff's August 23, 2010, email, nothing in the timing of the alleged adverse employment actions could permit a reasonable factfinder to conclude that Defendant EDD was motivated by retaliatory intent for any of the alleged adverse employment actions, whether viewed collectively or individually.

For these reasons Defendants' motion for summary judgment on Plaintiff's claims for retaliation is granted.

E.     Failure to Prevent Harassment, Discrimination and Retaliation Claim

Defendants argue that summary judgment should be granted on Plaintiff's failure to prevent harassment, discrimination, and retaliation claim[16] because "no liability can arise from

---

[16]     Plaintiff purports to bring this claim pursuant to FEHA and 29 C.F.R. § 1604.11(f).  29 C.F.R. § 1604.11(f) is a subsection of EEOC's "Guidelines on Discrimination Because of Sex" which suggests in part that employers "take all steps necessary to prevent sexual harassment from occurring."  *See Brodie v. Bd. of Trustees of California State Univ.*, No. CV 12-07690 DDP AGRX, 2014 WL 359244 at *5 (C.D. Cal. Feb. 3, 2014) (noting this provision details "what an employer 'should' do according to best practices, not what an employer 'must' do).  The Court construes this as an attempt to make a claim analogous to a FEHA failure to prevent claim under Title VII.

1  not preventing discrimination, harassment or retaliation that did not occur." (ECF No. 50-1 at

2  30.)

3         Plaintiff did not address this argument in its opposition, so the Court applies the standard

4  for an unopposed motion for summary judgment with respect to this claim. (*See* ECF No. 58.)

5         The Court determines that Defendant EDD is entitled to judgment as a matter of law on

6  this claim.  A plaintiff seeking to recover damages based on a claim of failure to prevent

7  discrimination, harassment, or retaliation must show three essential elements: (1) he was

8  subjected to discrimination, harassment, or retaliation; (2) the defendant failed to take all

9  reasonable steps to prevent discrimination, harassment, or retaliation; and (3) the defendant's

10 failure caused the plaintiff to suffer injury, damage, loss, or harm. *Hatfield v. DaVita Healthcare*

11 *Partners, Inc.*, No. C 13-5206 SBA, 2014 WL 2111237, at *5–6 (N.D. Cal. May 20, 2014)

12 (setting out the standard under FEHA); *see also Williams v. Cty. of Marin*, No. C03-2333 MJJ,

13 2004 WL 2002478, at *10 (N.D. Cal. Sept. 8, 2004) (suggesting the same standard would apply

14 under Title VII and that such claims have been recognized).[17]

15        Plaintiff is unable to satisfy the first element as the Court has granted summary judgment

16 in favor of Defendants on each of Plaintiff's discrimination, harassment, and retaliation claims.

17 *See Williams*, 2004 WL 2002478 at *10; *Mayes v. Kaiser Found. Hosps.*, No. 2:12-cv-1726 KJM

18 EFB, 2014 WL 2506195, at *14 (E.D. Cal. June 3, 2014); *Trujillo v. N. Cty. Transit Dist.*, 63 Cal.

19 App. 4th 280, 289 (1998), *as modified* (May 12, 1998).

20        For these reasons Defendants' motion for summary judgment on Plaintiff's failure to

21 prevent harassment, discrimination, and retaliation claim is GRANTED.

22              F.      California Labor Code Sections 226.7 and 512 Claim

23        Defendants argue that summary judgment should be granted on Plaintiff's claim that

24 Defendant EDD violated Sections 226.7 and 512 of the California Labor Code because Defendant

---

25 [17]    The Court expresses no opinion as to whether such a claim exists under Title VII.  Neither party has cited
26 any authority to suggest it does.  The case cited in *Williams* does not seem to stand for this proposition as it simply
   discusses the circumstances where an employer can avoid liability in a Title VII sexual harassment claim. *Compare*
27 *Williams*, 2004 WL 2002478 at *10 n.11 (pinciting *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991)) *with Ellison*,
   924 F.2d at 881 ("We next must determine what remedial actions by employers shield them from liability under Title
   VII for sexual harassment by co-workers.").  The Court assumes solely for the purposes of this motion such a cause
28 of action would have the same elements in FEHA.

EDD is a public entity whose employees are not covered by those sections.  (ECF No. 50-1 at 31–32.)

Plaintiff did not address this argument in its opposition, so the Court applies the standard for an unopposed motion for summary judgment with respect to this claim.  (*See* ECF No. 58.)

The Court determines that Defendant EDD is entitled to judgment as a matter of law on this claim because Sections 226.7 and 512 of the California Labor Code do not apply to its employees.  The California Court of Appeals has held that "unless Labor Code provisions are specifically made applicable to public employers, they only apply to employers in the private sector."  *Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal. App. 4th 729, 733 (2009).  In *Johnson*, the California Court of Appeals specifically found that Section 512 did not apply to public employers.  *Id.* at 739.  This was reaffirmed in *California Correctional Peace Officer's Ass'n v. State*, 188 Cal. App. 4th 646, 650 (2010), which also concluded Section 226.7 did "not apply to public employees."  *Id.*

There seems to be no dispute that Defendant EDD is a public entity and Plaintiff was its employee.  (*See* ECF No. 8 at 1–2 (describing Defendant EDD as a "government agency" and "California government entity" in the First Amended Complaint).)  The parties have not identified, and the Court has not located any authority for, treating Defendant EDD differently from other public entities with respect to these sections of the Labor Code.

For these reasons Defendants' motion for summary judgment on Plaintiff's failure to prevent harassment, discrimination and retaliation claim is GRANTED.

       G.    <u>California Labor Code Sections 2698 and 2699 Claim</u>

Defendants argue that summary judgment should be granted on Plaintiff's PAGA claim pursuant to Sections 2698 and 2699 of the California Labor Code because the claim is being pursued based on EDD's alleged violations of California Labor Code Sections 98.6, 1102.5, 226.7, and 512, each of which fail as a matter of law.  (*See* ECF No. 50-1 at 31–32.)

Plaintiff did not address this argument in its opposition, so the Court applies the standard for an unopposed motion for summary judgment with respect to this claim.  (*See* ECF No. 58.)

The Court determines that Defendant EDD is entitled to judgment as a matter of law on

1    this claim because Plaintiff's predicate claims under of Sections 98.6, 1102.5, 226.7, and of the

2    California Labor Code have failed as a matter of law.  *Gofron v. Picsel Techs., Inc.*, 804 F. Supp.

3    2d 1030, 1043 (N.D. Cal. 2011); *Wentz v. Taco Bell Corp.*, No. 1:12-cv-1813 LJO DLB, 2012 WL

4    6021367, at *5 (E.D. Cal. Dec. 4, 2012).

5            For these reasons Defendants motion for summary judgment on Plaintiff's PAGA claim is

6    granted.

7        **IV.    CONCLUSION**

8            For the reasons set forth above, Defendants' Motion for Summary Judgment or,

9    alternatively, Motion for Summary Adjudication is GRANTED.  The Clerk of Court shall enter

10   judgment in favor of the Defendants and close this case.

11               IT IS SO ORDERED.

12

13   Dated: January 4, 2017

14

15                                                    _____
16                                                    Troy L. Nunley
                                                      United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

36